

ROBERT A. GORDON
U. S. BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

| | | |
|---|---|---|
| In re: | * | |
| Michael T. Cleary | * | Case No. 08-10319-RAG |
| Debtor | * | Chapter 7 |
| *  *  *  *  *  *  | * | |
| Timothy Limberger and Lisa Limberger | * | |
| | * | |
| Plaintiffs | * | |
| v. | * | Adversary No. 08-00264 |
| Michael T. Cleary | * | |
| Defendant | * | |
| | * | |
| *  *  *  *  *  *  *  | *  *  *  *  *  *  * | |

## MEMORANDUM OPINION IN SUPPORT OF JUDGMENT ORDER DECLARING CERTAIN DEBTS TO BE NON-DISCHARGEABLE AND EXCEPTING THE SAME FROM THE DEBTOR'S DISCHARGE AND DISMISSING THE COMPLAINT AS TO OTHER DEBT THAT SHALL BE DISCHARGED

## I.      Preliminary Statement

This litigation represents a part of Plaintiffs Timothy and Lisa Limberger's effort to be made whole in the wake of their badly bungled, $1.2 million dollar new home construction project commenced in 2006.  Interminable contractual breaches and the resulting frustration ultimately convinced the Limbergers that their original contractor – Trinity Home Builders, L.L.C. (Trinity), partially owned and fully controlled by the Debtor/Defendant, Michael Cleary – had to be terminated, a new contractor able to complete the job hired and a state court complaint against Trinity, their lender SunTrust Mortgage (SunTrust), the Debtor's sister (Mary Kate), and Mr. Cleary, filed.[1]  The Limbergers' decision was justified: the evidence that chronicled the missteps and queer business practices of SunTrust and the Debtor was often astounding and, while he may have known how to build large homes, Mr. Cleary was simply in well over his head as a financial manager.  Per his sister's testimony, pre-bankruptcy Trinity, a company born in 1994, was frequently in need of emergency lending as a direct result of Mr. Cleary's fiscal mismanagement.[2]  Likewise, from October 2006 until its bankruptcy filing Trinity's operating account was often overdrawn.  While evidence detailing the foregoing broad overview was proffered to either establish or rebut certain points, or simply for context, this Opinion is limited to the narrow inquiry of whether the debts arising from the Limbergers' three claims for relief should be excepted from the Debtor's discharge.

The Court concludes that Mr. Cleary's fraudulent procurement of 'deposit' money from SunTrust by falsely representing that the same was needed as a condition to purchasing specific

---

[1] There may have been other parties in the state court action but those named above are the litigants that became known to the Court during the course of the trial.

[2] Trinity filed its own Chapter 7 bankruptcy case on January 7, 2008, at Case No. 08-10318, the same day as Mr. Cleary.

construction materials, but which money was neither needed nor used for the purposes represented, and which money was charged against the Limbergers' construction loan, supplies a clear and convincing basis for declaring non-dischargeable the debts arising from those transactions and for that reason, excepting them from the Debtor's discharge.  Conversely, the Limbergers' third claim, arising from the money paid to Trinity by SunTrust to cover the cost of a pre-existing water well that Trinity did not construct, but which SunTrust had prior knowledge of, cannot be declared non-dischargeable because SunTrust, and therefore the Limbergers, cannot be held to have justifiably relied upon any misrepresentation of Mr. Cleary that caused the payment to be made.

## II.    Procedural History

Mr. Cleary filed for personal bankruptcy in this Court on January 7, 2008 at least in part to stay the state court litigation filed against him by the Limbergers.[3]  On April 14, 2008, the Limbergers filed a three count Complaint to Determine Non-Dischargeability (Complaint) against Mr. Cleary.[4]  The Complaint relies upon 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6) and prays that three distinct debts be excepted from the Debtor's discharge.[5]  The Debtor filed his Answer to the Complaint to Determine Non-Dischargeability on August 5, 2008 and generally denied the Complaint's factual allegations.[6]  Trial was held on October 26th, 27th

---

[3] Two other unrelated civil actions were pending against Mr. Cleary when he filed, both involving claims of construction suppliers.  One had been reduced to a confessed judgment in 2007.  There was also a large amount of personally guaranteed debt, owed to construction suppliers and trade creditors, listed on his Schedule F.

[4] The Limbergers filed a Proof of Claim in the amount of $1,000,000 in the main case on October 20, 2008. That claim was never objected to and therefore is deemed allowed.  11 U.S.C. § 502(a).

[5] Unless otherwise indicated, all statutory references are to the Bankruptcy Code (Code) found at Title 11, United States Code.

[6] While this case was underway, the Limbergers simultaneously prosecuted their litigation against SunTrust.  While the history and outcome of that litigation were not described in detail at trial, the Court became aware of some aspects of it including the fact that a confidential settlement agreement was reached between the Limbergers and

and November 12, 2010 and closing arguments were heard on January 24, 2011.  The parties

were encouraged to submit post-hearing memoranda and the same were filed on February 23,

2011.  The dispute is now ripe for decision.[7]

## III.   Factual Background

At the time of the events in question, the Debtor was President and a forty per cent (40%)

shareholder of Trinity.  Mary Kate testified that she and their mother were also shareholders but

she made it clear that it was the Debtor who was in charge, directing and managing Trinity's day

to day operations.[8]  On May 2, 2006, Trinity entered into a construction contract with the

Limbergers. The contract's purpose was to build a home on a parcel of unimproved land located

at 1109 Glenville Road in Churchville, Maryland (Glenville Road).  Around the same time, in

order to fund the project, the Limbergers entered into construction financing arrangements with

SunTrust.  One agreement among several was a Construction-Permanent Loan Retail

Commitment Letter (Commitment Letter) executed on May 16, 2006 and another was a

Construction Loan Agreement (Loan Agreement) dated May 26, 2006.  There was no real

dispute that, among other things, those agreements were intended to govern the disbursement of

financing to Trinity in order to fund Glenville Road's construction.

Per Section II of the Commitment Letter, funds were only supposed to be advanced to

Trinity in accordance with an "Approved Draw Schedule", incorporated into the Commitment

---

SunTrust. The terms of the settlement were not included in this record.  Trial in this case was delayed for a time
while that case was resolved.

[7] There has been a lengthy delay between the last filings and the issuance of this Opinion.  As previously explained
to the parties, the Court was unable to prepare this Opinion in a timely fashion for reasons that were both serious and
beyond its control.  Nevertheless, the Court apologizes again for the untoward passage of time.

[8] Mary Kate apparently had worked for Trinity at one time but she acknowledged that she left in 2004 and had
neither a business nor employment relationship with Trinity during the time of the relevant events.  After this
dispute boiled over, however, she testified that she returned to work for Trinity in 2007.

Letter and Loan Agreement. The Commitment Letter expressly provided that the, "funding of Draws will be for completed work only."[9] A total of approximately $844,661.51 in draws was paid by SunTrust to Trinity over the course of the project and, for the most part, it appears draws were made in accordance with the quoted requirement: an inspector would visit Glenville Road and inscribe percentages within different category headings on a printed form and thereby confirm completed work.[10] The Limbergers complained of three specific instances of payment to Trinity, one of which occurred subsequent to an inspection and two of which did not.

### a.     The Well

The first debt complained of is the payment by SunTrust of $23,793.29 – two per cent (2%) of the total loan amount – to Trinity on July 21, 2006 for the completion of the water well. On July 20, 2006, the same day the building permit was issued, Mr. Cleary marked up a draw request by hand and submitted it to SunTrust. At the bottom of the facsimile that Mr. Cleary used to transmit the Draw Schedule, he also hand wrote, "Kathy, I included a copy of the Limberger's draw schedule and I have document (sic) what items are done to this point. Thanks Mike". The attached Draw Schedule was filled in and signed by Mr. Cleary with five separate

---

[9] In construction parlance, a 'draw' means a payment. It is undisputed that the Limbergers were never shown, or asked to approve, a draw schedule when the project began. Furthermore, and notwithstanding the Commitment Letter's express language, a SunTrust representative (Thomas Redfern) testified that SunTrust had full, complete and unfettered discretion to disburse funds to Trinity for any, or no, reason at all and indeed could have disbursed the entire loan at the inception of the project even before a spade was filled with the first pile of dirt. That interpretation struck the Court as absurd and not a little arrogant in light of the quoted language. Yet, Mr. Redfern's evident hubris also seemed to reflect the precise attitude that, along with Mr. Cleary's shortcomings, ultimately spelled disaster for the project.

[10] Multiple versions of these forms, reflecting percentage completion and construction progress, were admitted into evidence. They were alternately described as Draw Schedules and Inspection Reports, depending upon the witness and/or the context. The Court's usage in this Opinion will follow the same rough pattern. In addition to the loan draws, the Limbergers personally paid a $62,613.90 deposit, and $88,858.10 in change orders, to Trinity.

percentages (spanning five separate categories) identified. [11]  The two per cent payment for the well was handwritten next to category 17, "Septic/Well/Tap Fees" listed on the Draw Schedule.

Before issuing the payment, SunTrust sent an inspector — Alan "Bud" Howe — to examine the project.  Mr. Howe testified that he approved the two per cent draw request for the well because while inspecting Glenville Road he observed a well cap.  Mr. Howe did not encounter Mr. Cleary during his inspection and Mr. Cleary never made any representations to Mr. Howe about the construction of the well.  In sum, Mr. Howe testified that because the well cap was visible, he confirmed in writing the well's completion by noting an appropriate percentage on the Inspection Report.  In turn, his confirmation gave SunTrust a basis to approve the two per cent draw.

There is no dispute that SunTrust knew that the well had already been dug and completed on Glenville Road when the Limbergers purchased the real estate.  The existence of the completed well was noted in both the Limberger's Improved Land Contract of Sale (Contract of Sale) for the lot and in a separate Well Completion Report, both of which were in SunTrust's possession when the financing was settled and, moreover, prior to Mr. Howe's inspection.  Thomas Redfern, SunTrust Senior Vice-President for Mid-Atlantic Construction Permanent Lending, testified to the foregoing and Mrs. Limberger asserted the same under oath in an affidavit filed against SunTrust in the state court litigation in addition to acknowledging the same at trial.  Hence, SunTrust had specific, advance knowledge of the well.  However, notwithstanding that knowledge, and the fact that Trinity neither dug nor completed the well, the requested draw was funded by SunTrust by wire transfer to Trinity.

---

[11] The total draw payment requested (and paid) for all categories was $214,139.54.

### b.    Windows and Trusses

On August 7, 2006 Mr. Cleary submitted another request for payment to SunTrust. However, in this instance he was not seeking payment for completed work.  Instead, he wrote to SunTrust, "I am requesting 2% from the windows/exterior door category & 2% from the roof framing/sheathing from the Limberger draw schedule to cover deposits required from the following invoices I have provided for you."  The letter then went on to explain that the two suppliers – 84 Lumber and Precision Built Truss Company (allegedly subcontracted by Jarvis Steel & Lumber Co., Inc. (Jarvis)) – demanded a fifty per cent (50%) deposit on orders of the magnitude required.[12]  Attached to the Debtor's letter was an estimate from each supplier.  The 84 Lumber estimate was dated January 20, 2006 and it was undisputed that this estimate (for window frames) was not created for the Glenville Road project but instead was created for the Limbergers' much larger prospective home project at another location that had been abandoned by the Limberger's well before August 2006.[13]  Mr. Cleary testified that when he put the request to SunTrust, both suppliers required the fifty per cent deposits as a matter of policy.  However, he also testified that they both independently 'changed their policy' thereafter and became willing to forego deposits.  Hence, Mr. Cleary said, he did not have to (and did not) use the advance to pay deposits although he could not specify what the money was used to purchase after the advance was made.[14]

SunTrust paid the requested draw ─ $47,586.56 ─ to the Defendant.  Nevertheless, both Mr. Redfern and Rebecca Hall (*nee* Mayberry), SunTrust's then construction loan manager and

---

[12] Both 84 Lumber and Jarvis had claims against Mr. Cleary personally when he filed bankruptcy.

[13] Testimony was to the effect that the Glenville Road project was, roughly speaking, twenty five per cent (25%) smaller in size than the first, abandoned project for which the 84 Lumber estimate was prepared in January 2006.

[14] It was demonstrated during cross-examination that the alleged "50% deposit" for Jarvis actually equaled 100% of the total cost of the material.  Moreover, Mr. Cleary testified that 84 Lumber sent him the January 2006 estimate "by mistake" on August 7th which he then, nevertheless, used to solicit the advance.

administrator, testified that when they did so, they relied on Mr. Cleary's representation that the deposit was needed in order to effectuate the transaction and they believed he was telling the truth when the decision was made to release the money.  They also testified that had they known that deposits were not required and, moreover, that Mr. Cleary did not intend to use the money to pay deposits (in other words that the Defendant had misrepresented the truth) then the payment would not have been approved.  Because they did not know of the deception and relied upon Mr. Cleary's representations, SunTrust wired the money into Trinity's account.

### c.      The Cabinetry

The final transaction occurred on November 1, 2006.  That day, Mrs. Limberger, both personally and through her business, paid $70,916.76 to Baldwin Kitchen and Bath, Inc. (Baldwin) as deposits for cabinetry to be installed at Glenville Road.  The deposits were needed to cover the net overage above the total allowance for cabinets as fixed by the cost schedule. Christopher Conley, Baldwin's President, testified that he personally received the deposit payments from Mrs. Limberger and made handwritten notations on the invoices (that also referenced her check numbers) to the effect that her deposits were "paid in full". Mr. Conley also testified that he gave copies of the invoices to Mr. Cleary.[15]

Later that day, Mr. Cleary forwarded a letter to Ms. Hall of SunTrust.  In pertinent part, he wrote, "I am faxing a request for deposit monies for the Limberger's cabinet order for 1109 Glenville Road.  I included a copy of the two cabinet contracts that are $164,530.94 and $31,385.52 collectively.  These total 195,916.46 which is $120,916.46 more than the $75,000 amount allocated for the cabinet portion of the $125,000 cabinet, countertop, vanity top and appliance allowance.  Obviously, the Limbergers are putting a lot of quality in their home.  I am

---

[15] At the time of the transaction, Mr. Cleary was also an officer of Baldwin and that company worked out of office space that adjoined Trinity's office.

therefore requesting 2% from the cabinet category, 1% from appliances and 1% from miscellaneous.  Please wire those funds into my account today."

Attached to his letter, transmitted to SunTrust via facsimile, were copies of the invoices given to Mrs. Limberger when she paid the deposits, save for one important change.  Mr. Conley's handwritten notations indicating that the deposits had been "paid in full" by Mrs. Limberger were gone from the versions sent to SunTrust by Mr. Cleary.  The reason for this is simple: Mr. Cleary used correction fluid, or "white-out", to delete the evidence of Mrs. Limberger's payment and forwarded the now defaced invoices to SunTrust as if nothing had been paid.  As a result, SunTrust wired the requested payment — $47,586.56 — into Trinity's account the same day.

Mr. Redfern and Ms. Hall both testified that they were unaware of the documents' alteration by Mr. Cleary, that they relied on his representation that the deposit was needed in order to effectuate the transaction and that they believed he was telling the truth when the decision was made to release the money.  They also testified that had they known Mr. Cleary had altered the documents and was not telling the truth, then the money would not have been released. Mr. Conley also testified that he did not request any deposits from either the Debtor or Trinity and, needless to say, none were paid by them.[16]

## IV.    The Debtor, Michael Cleary

Debts excepted from the general discharge comprise a narrow class of obligations with each one grounded upon, and reflecting, a particular policy choice of Congress.  Section 523(a)(2)(A), which guards against the discharge of debts created by false pretenses, false representations, or actual fraud, has a special significance in the overall context of bankruptcy.

---

[16] The Limbergers asserted that the money received by Trinity from SunTrust was used by Mr. Cleary to purchase cabinets for installation at his sister Mary Kate's home construction project.  That claim was disputed by Mr. Cleary and Mary Kate.

The subsection focuses upon conduct that is central to the Code's 'fresh start' policy – a debtor's honest behavior.[17]  As the Debtor's honesty at the time of the questioned transaction(s) is a crucial inquiry, the debtor's intent must necessarily be examined.  In this case, the totality of the circumstances leaves the Court utterly convinced that Mr. Cleary intentionally behaved dishonestly in each of the three transactions.  This is so for several reasons.

Mr. Cleary's crude alteration of the cabinetry invoices is singular, powerful evidence. The different sets of cabinetry invoices admitted at trial present two different versions of the same documents: one set is marked "paid in full" while on the other set, that crucial indication (and accompanying notations) is obliterated.  There is no question that Mr. Cleary altered the invoices.  He admitted as much during his Section 341 meeting of creditors, although he changed his testimony during his deposition and at trial.  The Court concludes that he told the truth during the Section 341 meeting (which was held on February 14, 2008, prior to the filing of the Complaint) before he realized that he might continue to be held liable for the Limbergers' claims.  Once that realization hit home however, the Court finds that he decided to change his testimony.

But whether Mr. Cleary testified on the topic or not, the Court would still conclude that he was responsible for the alteration.  He prepared the facsimile transmittal to SunTrust that requested the release of the 'deposit' and he attached and used the altered invoices to spark the payment.  Then, when the draw was issued, it is undisputed that the money was not used by him to fund a cabinet deposit.  Indeed, he *could not have* used it for that purpose because Mr. Conley of Baldwin had *not requested* a deposit and would have known that the Limbergers deposit had already been paid.  The conclusion is inescapable that Mr. Cleary actively (and crudely)

---

[17] As will be explained *infra*, the Court has concluded that the Defendant's conduct did not violate either Sections 523(a)(4) or 523(a)(6).

misrepresented the truth in this transaction in order to cause SunTrust to release a portion of the Limbergers' financing and then used it for his own purposes.[18]

Beyond the explosive impact of that particular transaction, Mr. Cleary's body language and general demeanor while testifying also spoke volumes.  This is particularly so with respect to his video-taped deposition.  Mr. Cleary was evasive, argumentative, contradictory and calculating in his testimony.  Simply put, during his deposition he did not appear to be telling the truth in response to even the simplest questions from Plaintiff's counsel. Indeed, at one point, even his own attorney Mr. Kotz lost patience with his string of evasive responses.  An honest witness has no reason to respond to straight forward inquiries with a string of evasions.  Yet, that is precisely what Mr. Cleary did.

Finally, Trinity's dire long term financial circumstances help to sketch in a motivation for Mr. Cleary's dishonest conduct.  While Mr. Cleary's sister Mary Kate admittedly was not affiliated with Trinity during the time of the Limberger project, she testified with compelling force (called as her brother's witness) as to the company's historical inability to pay its debts in the ordinary course of business.  In sum, she testified that a total of approximately $700,000 was lent to Trinity by her mother, herself and Mr. Cleary during Trinity's life.  She explained that the reason for Trinity's financial struggles was Mr. Cleary's well-meant penchant for underbidding jobs.  Whatever the reason, and if her testimony is to be believed, the volume of emergency loans extended to Trinity over its relatively brief lifespan is compelling evidence that it was never strong enough to stand on its own.  Trinity's fortunes do not excuse Mr. Cleary's decisions, but they do help explain why he would take the desperate and dishonest steps outlined and proven at trial.

---

[18] Per Ms. Hall's testimony, Mr. Cleary's ruse worked to perfection.  She testified that she told her superior at SunTrust that Mr. Cleary was faxing an agreement "signed by the borrowers" in support of the deposit request.

## V.    Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding pursuant to Section 157(b)(2)(I).  Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

## VI.    Legal Standard for Dischargeability Under the Subsections Relied Upon

The Limbergers rely upon Sections 523(a)(2)(A), 523(a)(4) and 523(a)(6) as their bases for asserting non-dischargeability.[19]  A plaintiff's case must satisfy five elements in order to prevail under Section 523(a)(2)(A).  *Grogan v. Garner*, 498 U.S. 279, 287-288 (1991)*; In re Rountree,* 478 F.3d 215, 218 (4th Cir. 2007); *Dubois v. Lindsley (In re Lindsley)*, 388 B.R. 661, 668 (Bankr. D. Md. 2008); *Guaranty Residential Lending, Inc. v. Koep (In re Koep),* 334 B.R. 364, 371-72 (Bankr. D. Md. 2005).  Those elements are: (1) that the defendant made a representation; (2) that the defendant knew at the time the representation was made that it was false; (3) that the defendant made the representation with the intent and purpose of deceiving the plaintiff; (4) that the plaintiff justifiably relied upon the false representation; and (5) that the plaintiff suffered damages as a proximate result of the representation.  *Lindsley*, 388 B.R. at 668; *Koep,* 334 B.R. at 371-72.  The debtor's intent shall be determined subjectively with a totality of the relevant circumstances taken into account.  *In re Rembert*, 141 F.3d 277, 281 (6th Cir. 1998); *In re Pleasants*, 231 B.R. 893, 898 (Bankr. E. D. Va. 1999), aff'd, 219 F.3d 372 (4th Cir. 2000). The applicable standard of reliance is justifiable, as opposed to reasonable, and that element is

---

[19] Although the Limbergers contracted with Trinity, the corporate veil is no bar to finding Mr. Cleary liable. Corporate officers are personally liable for their torts "even though performed in the name of an artificial body."  *In re Hildebrand*, 230 B.R. 72, 77 (Bankr. D. Md. 1999) (citing *Wilcoxon Construction, Inc. v Woodall (In re Woodall)*, 177 B.R. 517, 522 n. 2 (Bankr. D. Md. 1995).

likewise to be assessed in accordance with the overall circumstances of the case. *Field v. Mans*, 516 U.S. 59, 73 (1995); *Colombo Bank v. Sharp (In re Sharp)*, 340 Fed. Appx. 899, 905, 2009 WL 2480841 (4th Cir. 2009). It is not necessary that misrepresentations be communicated directly to the creditor so long as there is reason to expect that the creditor will rely on the misrepresentation and that her conduct will be detrimentally influenced thereby. *Sempione v. Provident Bank of Md.*, 75 F.3d 951, 962 (4th Cir 1996).[20]

A debt shall be declared nondischargeable under Section 523(a)(4) if it was obtained through: 1) fraud or defalcation while acting in a fiduciary capacity, 2) embezzlement, or 3) larceny. *See Wilcoxon Construction, Inc. v. Woodall (In re Woodall),* 177 B.R. 517 (Bankr. D. Md. 1995). The Limbergers asserted that Mr. Cleary embezzled the money advanced to him.[21] In order to establish embezzlement, the creditor must prove the entrustment to the debtor of her property which the debtor, with intent to defraud, appropriates for a use other than that for which it was entrusted. *Board of Trustees, v. Bucci,* 493 F.3d 635, 644 (6th Cir. 2007); *In re Hambley*, 329 B.R. 382, 401 (Bankr. E.D. N.Y. 2005); *In re Bevilacqua*, 53 B.R. 331, 333-34 (Bankr. S.D. N.Y. 1985).

In order to achieve nondischargeability under Section 523(a)(6), the creditor must prove that the debtor's actions constituted a tortuous injury to property that was willful and malicious. *See McLean, Koehler, Sparks & Hammond v. Hildebrand (In re Hildebrand),* 230 B.R. 72, 79

---

[20] The *Sempione* case involved representations made by a Maryland letter of credit issuer to the third party beneficiary of that letter of credit that were later relied upon by the beneficiary's lender in an attempt to enforce a fraud claim against the Maryland issuer. *Id* at 954, 962. The Court of Appeals reversed the District Court's grant of summary judgment for lack of standing, finding that Maryland law would not require that the representations be made directly to the enforcing lender as long as there was a reasonable expectation that the representation would either be communicated to the enforcing lender or would influence its conduct. *Id.* at 962. In this case, SunTrust essentially claimed and exercised full power over disbursements and, to the extent the Limbergers would ultimately be liable for the loan balance, controlled their destiny from a vantage point much greater than that of a mere agent or messenger. For purposes of this case, a misrepresentation to SunTrust was tantamount to a misrepresentation to the Limbergers.

[21] The Limbergers also asserted the ground of larceny but abandoned it in their post-trial memorandum.

(Bankr. D. Md. 1999).  Under Section 523(a)(6), "nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  *Id*. (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)); *In re Duncan*, 448 F.3d 725, 729 (4th Cir. 2006).

In all non-dischargeability cases, a creditor must prove their allegations by a preponderance of the evidence, *Grogan,* 498 U.S. at 291, and all exceptions to discharge are strictly construed against the creditor.  This high evidentiary threshold is meant to "protect the purpose of providing debtors a fresh start." *In re Rountree,* 478 F.3d at 219.

**VII.    Analysis**

   **a.    The Cabinetry**

All five criteria of Section 523(a)(2)(A) are met clearly and convincingly with respect to the debt — $47,586.56 — created by Mr. Cleary's draw request for a non-existent cabinetry deposit.  It is undisputed that Mr. Cleary made the written representation — a specific request for a draw payment to cover a needed 'deposit' — via the facsimile transmittal quoted in Section III c. above.  While Mr. Cleary denied at trial that he altered the invoices, the Court concludes that his testimony in that regard is just as false as the altered invoices themselves.  Mr. Cleary prepared the facsimile and with it sent the invoices.  He therefore had to have known from the face of the original invoices (given to him by Mr. Conley) that Mrs. Limberger had already paid the deposits, making his representations to SunTrust knowingly false when made. Likewise, there can be no other reasonable conclusion but that Mr. Cleary made the representations with the intent and purpose of deceiving SunTrust into releasing the draw.  The false representation was the direct cause of SunTrust's action and the bank's reliance upon it was, at a minimum, justifiable: under all the relevant circumstances, SunTrust was entitled to take the invoices, and

Mr. Cleary's request, at face value, foregoing further investigation of the same.[22]  Mr. Cleary prepared the invoices, and the written representations, to appear legitimate under the circumstances.  SunTrust knew Mr. Cleary and had worked with him before.  Indeed, Trinity was the bank's customer, running thousands of dollars through its operating account.  These facts are sufficient to justify SunTrust's release of the draw as a part of a normal, working relationship, without further investigation.  Finally, as the money was not used for the purpose intended, or any purpose directly related to construction of Glenville Road, Mr. Cleary's fraud wrongfully increased the Limberger's loan balance, leaving them liable for money that was neither needed nor used for their new home project.[23]

In Defendant's Post-Trial Memorandum (Defendant's Memorandum), Mr. Cleary does not deny that he used the artifice described above to secure the subject draw from SunTrust. Instead, he contends that he "intended" to use the draw for deposits when he caused SunTrust to release the money and, moreover, that after Trinity's ouster from the Glenville Road project, he told the Limbergers he would repay the money.  These after the fact pieties are ineffective to rebut the charge.  How could he have "intended" to pay a deposit to Baldwin when Mrs. Limberger had already done so and why, if he was behaving honestly, would he use deceptive measures to secure the money in the first instance?

Nevertheless, and perhaps more to the point, Mr. Cleary also contends that he did not, in fact, secure the money by misrepresentation, fraud or false pretenses.  Instead, he blames SunTrust and the Limbergers.  As for SunTrust, he asserts that since Mrs. Limberger had

---

[22] An explanation of the justifiable reliance standard is provided in Section VII c., *infra*.

[23] The Limbergers had to pay the SunTrust loan in full though a refinancing loan from Branch, Banking & Trust Company.  This transaction is explained in Plaintiff's Motion to Reopen Case to Receive Undisputed Evidence (Motion to Reopen) filed February 23, 2011 (Dkt. No. 104).  A separate order granting the Motion to Reopen will be entered because it submits specific, undisputed information that the Court requested during oral argument. Defendant has had an equal opportunity to rebut the truth of that information but has not done so.

instructed the bank not to release any draws to be used for deposits, SunTrust "could not have relied upon anything Cleary said or requested" in that regard.[24]  Defendant's Memorandum at 11. Moreover, Mr. Cleary asserts that, contrary to her testimony, Mrs. Limberger approved the draw request as reflected by the SunTrust business records that memorialize Ms. Hall's asserted communications with Mrs. Limberger.

The apparent conundrum raised by the evidence regarding the alleged communications between SunTrust and Mrs. Limberger as to whether the two draw requests (the cabinetry request discussed in this Section and the windows and trusses request addressed in the next Section) were approved by Mrs. Limberger is fairly mystifying.  In brief, the SunTrust records appear to suggest on the surface that after Mr. Cleary made his fraudulent requests for deposit draws, Ms. Hall contacted Mrs. Limberger to request her consent and that SunTrust made the advances after consent was given.  Yet, while SunTrust's emails and log books reflect a pattern of diligence by Ms. Hall in seeking Mrs. Limberger's approval, Ms. Hall could not affirmatively state that she remembered a conversation with Mrs. Limberger where consent was expressly given.  There are no written confirmations.  Mrs. Limberger, on the other hand, testified convincingly that she did not give her consent; indeed, why would she have given her consent to the cabinetry draw after having paid the deposit herself in full earlier the same day? Furthermore, Mrs. Limberger's multiple written communications to SunTrust over the course of the project are equally convincing in evidencing her concern over SunTrust's release of draw payments and its overall handling of payments to Trinity.  Finally, when Mr. Cleary made the fraudulent windows and trusses draw request in August 2006, Mrs. Limberger was in Seattle on

---

[24] The Court cannot find that Mrs. Limberger's instructions to SunTrust negate Mr. Cleary's liability.  After all, while he deleted the 'paid in full' notation he did not delete Mrs. Limberger's signature.  His selective deception was effective in making it appear that she consented to his request.

business.  She testified that she neither spoke with Ms. Hall nor had the electronic equipment available to communicate with her in writing during that trip.

Significant trial time was devoted to the debate over this issue and, ultimately, whether Mrs. Limberger approved the draw requests.  Nevertheless, the mystery does not need to be conclusively untangled to resolve this dispute.  This is so because even if Mrs. Limberger had approved the release of the money, she would have done so solely on the basis of Mr. Cleary's fraudulent representation.[25]  The lack of agreement on this point between the Limbergers and SunTrust cannot change the fundamental fact that Mr. Cleary misrepresented the truth to secure the payment of money he was not entitled to under the circumstances and then did not use the money for the specific purpose asserted.[26]

### b.  The Windows and Trusses

While not quite as egregious as document alteration, Mr. Cleary's use of a stale, inflated invoice to fraudulently secure a $47,586.56 draw ostensibly for the purpose of paying deposits on windows and trusses is just as wrongful.  Hence, the same remedy – exception of the resulting debt from his discharge – shall apply. All five criteria of Section 523(a)(2)(A) are again satisfied clearly and convincingly by the evidence with respect to Mr. Cleary's request for a materials deposit that was neither needed nor used for that purpose.

---

[25] If forced to resolve the issue, the Court would find that Mrs. Limberger did not approve the deposit requests.  She lodged several written complaints questioning payments to Mr. Cleary and there was no direct, written evidence ascribed to either SunTrust or Mr. Cleary suggesting that she was being unreasonably inconsistent; i.e., that she had approved deposit advances notwithstanding her protests.  Likewise, why would she have approved a windows and trusses deposit if, as Mr. Cleary asserts, her selections were not "finalized" at the time he sought the advance.  In the same vein, it simply would not have made sense for her to approve a second cabinetry deposit after making a first, especially in light of the detailed supervision she tried to exercise over the project.  Finally, Mr. Cleary seemed to suggest during his testimony that he worked out an arrangement with the Limbergers to cure the wrongful deposit problem.  If Mrs. Limberger approved the deposits, why would Mr. Cleary agree to a remedy unless he knew the deposits had been advanced in reliance on a false representation and the money spent by him elsewhere.

[26] The Limbergers claimed that the money was used to fund ongoing construction at Mary Kate's home project. The evidence was strong that such may have been the case.  However, the fact that Mr. Cleary did not use the money for the purpose represented, or use it for the Limberger's project at all, is decisive enough to except the debt from his discharge.

It is undisputed that Mr. Cleary made the written representation to SunTrust via the August 7, 2006 facsimile transmittal quoted in Section III b. above.  While Mr. Cleary asserted that the request was for a legitimate purpose, the 84 Lumber invoices that he used to make the request were not created by the supplier for the Glenville Road project.  If there had been a legitimate demand for a fifty per cent deposit from the suppliers the day Mr. Cleary forwarded the request to SunTrust, then integrity, honesty and fair dealing would have mandated a timely estimate that gave pricing specifically for the Glenville Road project.  Moreover, the court finds that Mr. Cleary's express representation that the money was needed to fund deposits was false; instead, the Court concludes that no deposits were required by the suppliers and, contrary to Mr. Cleary's testimony, the best evidence of this is that no confirmation from a supplier's representative was offered into evidence and no deposit was ever paid.[27]  The Court finds that Mr. Cleary used the stale invoices to draw against the Limbergers loan account with no intention of using the money for the stated purpose.  Hence, the Court also finds that he knew the representation was false when made.  Likewise, there can be no other reasonable conclusion but that Mr. Cleary made the representation with the intent and purpose of deceiving SunTrust, as his false representation was the direct cause of the payment of the draw to Trinity.  The Court further finds and concludes that for the same reasons explained with respect to the cabinetry, SunTrust's reliance upon his representations was, at a minimum, justifiable.  Finally, as the money was not used for the purpose intended, or apparently any purpose directly related to the construction of Glenville Road, Mr. Cleary's fraud wrongfully increased the Limberger's loan balance, leaving them liable for money that was neither needed nor used for the construction of their home.

In Defendant's Memorandum, Mr. Cleary relies upon his testimony to the effect that when he made the request to SunTrust on August 7, 2006 the two suppliers did require deposits

---

[27] The specific work wasn't completed until months later.

but thereafter (and after the Limbergers adjusted the construction plans) both reversed their policy and ceased requiring advance deposits.  Mr. Cleary does not assert that the payment in question was actually used for the purpose he represented.  He simply argues that since the specific materials were ultimately installed in Glenville Road before Trinity was booted from the project, he cannot be held liable for this draw request.  In Mr. Cleary's words, "Plaintiffs have failed to explain why they are entitled to be reimbursed for work and materials actually supplied by Trinity.  Plaintiffs simply cannot show that they were damaged by the payment of the deposits." Defendant's Memorandum at 11.  He also asserts that, as with the cabinetry, the SunTrust records establish that Mrs. Limberger gave Ms. Hall her consent to the draw.

What the evidence showed with certainty, and what this Court finds, is that Mr. Cleary intentionally misrepresented the need for these illusory deposits in order to use the Limberger's construction line of credit as if it were Trinity's (or perhaps his own) to do with as he chose.  Whether the supplies were actually paid for by additional draws against the SunTrust financing at a later date (and charged *again* to the Limbergers' account) is irrelevant.  What matters is that this particular draw was induced by a false representation and the money was not used for the purpose represented.  The correct outcome cannot be to saddle the Limbergers with double liability for a single set of materials or portions thereof.  The damages are found in the illegitimate increase of the Limbergers' loan balance for money spent on a purpose unrelated to the Glenville Road project.  Moreover, and as with cabinetry, the Court concludes that the mystery as to whether the deposit request was approved or disapproved by Mrs. Limberger does not need to be resolved by way of a conclusive finding – if Mrs. Limberger did approve the

request, she did so because she was deceived by Mr. Cleary as was SunTrust.  Accordingly, the Court finds that the debt created shall be excepted from Mr. Cleary's discharge.[28]

###   c.    The Well

The debt created by the two per cent (2%) allowance for the well presents a different set of circumstances than the first two categories of debt.  While Mr. Cleary may have been just as dishonest in actively seeking payment for work – the construction of Glenville Road's well – that Trinity did not perform and which had already been completed, the Court cannot find that SunTrust justifiably relied upon Mr. Cleary's representation.[29]

In *Field v. Mans,* the Supreme Court held that Section 523(a)(2)(A)'s fraud exception requires a finding of justifiable, as opposed to, reasonable, reliance.  516 U.S. 59, 74-75 (1995). The Court relied in part upon the Restatement (Second) of Torts (1976) to give heft to the standard:

> [A] person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation.
> *            *            *
> Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct in all cases.
> *            *            *
> Justifiability is not without some limits, however…a person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.

---

[28] The evidence also established that the Limbergers were forced to hire another company to complete the project with the work about seventy per cent (70%) complete at the time of Trinity's dismissal.

[29] The Court does find that Mr. Cleary misrepresented the truth when he indicated on the Inspection Report/Draw Schedule that "2%" ought to be released under this heading.  The only relevant work that had been accomplished at that time was the construction of the well and the installation of the well cap.  Trinity did neither and he had to have known that at the time the request was made.

*Id.* at 70-71 (quoting Restatement (Second) of Torts §§ 540, 545A & 541 (1976), internal citations omitted).

In *Colombo Bank v. Sharp*, the Fourth Circuit stressed the parameters erected by *Fields* and explained that:

> a [creditor's] duty to investigate can arise when the surrounding circumstances give rise to red flags that merit further investigation. This analysis turns on 'an individual standard of the [creditor's] own capacity and the knowledge which he has.' Thus, when the circumstances are such that they should warn a creditor that he is being deceived, he cannot justifiably rely on the fraudulent statements without further investigation.

340 Fed Appx. at 907, 2009 WL 2480841**6 (quoting *Field,* 516 U.S. at 72).

In this case, and as low a hurdle as the justifiable reliance standard may be, the Limbergers' claim for the money released for the already constructed well must be unhorsed by a common sense application of the rule. SunTrust did not need to investigate to know that the well already existed and was not constructed by Mr. Cleary. SunTrust had the Limberger's Contract of Sale and Well Completion Report in its own records at the time the draw request was made. Mrs. Limberger expressly asserted as much in an affidavit in support of summary judgment in the state court litigation against SunTrust and admitted the same at trial. The Court cannot pretend that SunTrust was ignorant of the facts or that the bank had to do anything other than double check the records already within its possession. In short, SunTrust knew about the well before Mr. Cleary made the request and the fact of its existence could have easily been confirmed by SunTrust before the payment was made.

The Court concludes that if the Limbergers are entitled to rely upon SunTrust's ignorance with regards to Mr. Cleary's false representations regarding the need for deposits for cabinetry, windows and trusses, then they must be bound by SunTrust's knowledge as to the pre-existing

well.  Accordingly, the debt arising from the two per cent draw advance for the well shall be discharged.[30]

## VIII.   Conclusion

In conclusion, the debts arising from Mr. Cleary's fraudulent requests for deposits shall be excepted from his discharge while the debt arising from the payment for the well shall be discharged.[31]

**End of Opinion**

---

[30] The Limbergers also relied upon Sections 523(a)(4) (embezzlement) and (a)(6) (intentional injury to property) in support of their non-dischargeability claims.  However, the Court concludes that the evidence does not support claims under these provisions. Mrs. Limberger repeatedly asserted that she did not consent to the money being entrusted to the Defendant, an essential element of embezzlement.  *Bucci*, 493 F.3d at 644.  Moreover, while the Limbergers pled larceny in their Complaint, both at trial and in their post-trial memorandum, they seemed to abandon that ground in favor of embezzlement.  Non-dischargeability under Section 523(a)(6) requires a finding that the debtor acted deliberately and intentionally to cause the injury, not merely an intentional act that leads to the injury.  *Duncan*, 448 F.3d at 729.  The Court does not find the requisite level of intent to injure the Limbergers or their property (if such is possible under this scenario) on the part of Mr. Cleary on the facts presented.

[31] Mr. Cleary filed a Motion Objecting to the Video Portion of Plaintiff's Trial Exhibit #25 on November 2, 2010 (Video Motion) (Dkt. No. 84).  The Video Motion will be denied as no objection to the video exhibit was lodged before trial nor is the Video Motion well-taken.  Defendant's concern is with how the video deposition was edited. However, the video had to be pared down in length (as with a transcript) and, if the Defendant's attorney had watched the video before trial, he could have submitted rebuttal portions to try and remedy any alleged prejudice.